*Joseph Coulon *against* John Morton and [*24 Josiah Hewes, executors of Joseph Anthony, deceased, surviving partner of Thomas S. Anthony, trading under the firm of Joseph Anthony & Son.

John Morton et al., executors, &c., *against* Joseph Coulon.

John Maybin, surviving partner of Joseph Anthony and Company *against* Joseph Coulon.

Joseph Coulon *against* John Maybin, surviving partner.

The court will not lend its aid to enforce a contract between a foreigner and a citizen, whereby vessels are bought and equipped, registered and navigated in the name of the latter and for the use of the former in violation of the laws of the

[Coulon *v.* Anthony's ex'rs and Maybin et e contra.]

United States; and on that ground set aside the reports of referees, though a **debt** was really due.

Court disapprove of letters written by a party to an individual referee on the subject in dispute, though done without an improper view.

THESE four actions were referred, by consent of the different parties, to John Perot, James Vanuxem and Robert Ralston, or any two of them.

On the 22d February 1803, they signed their reports.

In the first action they found for the plaintiff Coulon the sum of $1207.23, due from the defendants as executors; and also that the plaintiff was entitled to receive from the defendants, or John Maybin, the surviving partner, 4,260,107 livres and 2 sous of a depreciated paper currency, placed under the care of Henry R. Balance at the Isle of France, being the sales of a cargo shipped by the ship Northern Liberties.

In the second action they found for the defendant.

In the third action they found for the plaintiff Maybin the sum of $30,708.16 due from the defendant Coulon; and that on the payment thereof the defendant would be entitled to receive from the plaintiff the ship Little Martha, subject to wharfage and attendance subsequent to 20th November 1802, and also to 112l. 8s. 6d. sterling, when the same should be recovered from Humble, Hurry and Holland, merchants in Liverpool.

And in the last action they found for the defendant.

These reports were excepted to on the part of Coulon and a great mass of evidence brought before the court on both sides. The referees were fully examined, and the matters both of fact and of law were argued at great length at the last term and during the present term by Messrs. Dallas and Du Ponceau in behalf of Coulon, and by Messrs. Ingersoll and M. Levy for the adverse parties. The hearing consumed nearly five days.

It appeared that Coulon was an opulent French citizen and came into this state an alien in the fall of 1794. He was naturalized here in February, 1798.

The partnership of Joseph Anthony and Son commenced in *1790. The partnership of Joseph Anthony, Josiah Hewes Anthony and John Maybin commenced in March 1796, Joseph Anthony died in September 1798, and Josiah Hewes Anthony died in 1800, leaving John Maybin surviving partner.

On the 26th December 1794, Coulon wrote a letter to Anthony and Son, wherein he informed them that he was the sole owner of the Danish ship Victorina and her cargo, then in the river Delaware; and requested them to execute a fictitious sale of the cargo in their books, and he would allow them a commission thereon to be paid by themselves, but requiring them to advance him $25,000 in the course of the next month. He enjoined them the most profound secrecy. In a subsequent let-

ter of the 6th January 1795, he again leaves it to them to fix their commissions, for transacting the business.

On the 16th of the same month, they returned him an answer, that they will only charge him the usual commissions; that the business with him was by no means desirable, and they did not covet it.

Joseph Anthony and Son received the cargo into their possession, on which Coulon affixed the selling prices.

In July 1796, Anthony and Company after a previous communication with Coulon, and by his order, authorized George and Hugh Pollock of New York to purchase the ship America on their account, and to go as far as $14,000. This was to be effected with the proper funds of Coulon, but the property masqued in the name of Anthony and Company. The purchase was made accordingly, and a further sum of $27,656 97 cents was expended in disbursements on her, exclusive of her first cost.

The America received a temporary register at New York as the property of Anthony and Company on the 30th August 1796, and sailed from that port to the East Indies; and in the month following, policies were effected on the ship and cargo, both at New York and Philadelphia, to a considerable amount, wherein they were warranted to be the property of Anthony and Company. She returned from Madrass into the port of Philadelphia in March 1798, underwent a complete repair, and was afterwards sold to Nicklin and Griffith for $60,000, and his register transferred to them by John Maybin, the surviving partner, on the 14th March 1799; and the bond at New York was cancelled, on the first register being delivered up. On the 16th February preceding, Coulon agreed to this sale, and expressed himself better pleased therewith, as it would enable the Company to receive the large debt due to them.

On the 3d July 1798, Joseph Anthony and Company complained that they were in advance for the America alone above $20,000, the goods of Coulon in their hands being locked up at *too high prices, and wished him to take his affairs into [*26 his own hands. In the course of that year, several letters from Coulon stated that the repairs of the America greatly exceeded the estimate and his instructions.

Another vessel called the Little Martha sailed under the names of Anthony and Company, though really belonging to Coulon. Shipments were also made in their names for the use of Coulon; and in one instance they obtained payment from the underwriters for a loss on the vessel Hannah.

Anthony and Company kept all the accounts of their joint concerns, Coulon placing the most unbounded confidence in them. He resided in Philadelphia, and was privy to all the transactions. On the 1st April 1802, the first general account current was furnished by Maybin.

In the course of the proceedings before the referees, Coulon

made no objections whatever to the nature of the illicit transactions he had been engaged in with Anthony and Son, or Anthony and Company; and he carefully avoided implicating Maybin, as being knowingly concerned in the breaches of the law of the United States. His objections to the accounts were grounded on a supposed violation of his orders, the injudicious expenditures of money, and improper conduct in the agency. Mr. Ralston, one of the referees declined acting in the business, on being informed of the gross violation of the laws of the Union : this produced a letter from Maybin, denying his privity of the unlawful transactions, and conjuring him in strong terms to proceed in the settlement : Coulon likewise importuned the referees to go on, and in consequence thereof they proceeded with the accounts.

Seventeen different exceptions were filed by Coulon to the reports ; whereof the greater part went to supposed specified errors of the referees, in allowing improper charges against him, and refusing him just credits. Three of the exceptions asserted, that on the face of the reports, two of them appeared to be ambiguous, unequal, and impossible to be carried into execution. One thereof charged his adversaries, with having made communications, to the referees, in his absence ; and two of them attributed errors in law to the referees, in sanctioning by their decision, transactions growing out of a contract, unlawful in itself and void.

The objections founded on the supposed errors in fact, were heard very fully, together with the observations of the referees and counsel thereon. The only difficulty which arose in the minds of the court, was on the question of law, whether under the circumstances of the case, they could judicially approve of these awards ; and to this point the present report of the cases is confined.

*27] \*The arguments of the counsel, on the part of Joseph Coulon, were substantially as follow :

Mr. Coulon, has done no more, than would naturally occur to the subject of a belligerent power, who wished to buy of a neutral, the chance of recovering his property. Mr. Maybin, the surviving partner of Anthony and Company, demands money from him, and asks the exercise of the powers of this court, to enforce the payment. He is the actor, and it lies with the court to say, whether legally his request can be granted.

Much stress will be laid on the decision of the referees ; but the determinations of such tribunals should be narrowly watched. Though the referees are judges of the parties' own choosing, they are bound by the law, equally as other citizens. The court must examine, before they can approve of a report, which is questioned. Neither can the court, nor referees, give effect to a contract, unlawful and immoral in itself.

The ship America was bought in New York, in pursuance of the original corrupt contract. She was an American bottom

registered in the names of Anthony and Company, but in trust for Coulon, and was purchased with his funds.

By the registering act of the United States, passed 31st December 1792, (2 U. S. Laws, 131,) no vessels shall be entitled to the benefits or privileges of the vessels of the United States, longer than they shall continue to be wholly owned by the citizens of the United States. § 1. When purchased by an agent, at a distance from the owner, such agent must swear, that she is solely owned by American citizens; and when the vessel shall arrive in the port of the owner, the temporary register is to be given up, on the owner's making oath of his property. § 12. If a vessel, registered as a vessel of the United States, shall be sold, in whole or in part, by way of trust or confidence to a foreigner, and such sale shall not be made known, she shall be forfeited, with her tackle, apparal and furniture. § 16. Upon the entry of vessels of the United States, from foreign ports, the owner is to swear, that the register contains the names of the owners, and that no foreign subject or citizen hath any share by the way of trust or confidence in such vessel. § 17. And if any register shall be fraudulently used for any vessel, not actually entitled to the benefit thereof, such vessel shall be forfeited. § 27.

The act of congress, to regulate the collection of duties on imports and tonnage, passed 2d March 1799, (4 U. S. Laws, 342,) prescribes the form of the oath to be taken on the entry of goods, in order to enforce the just payment of the duties, imposed by the laws of the Union.

What perjuries and frauds must this agreement between the parties have given birth to! But Coulon was a stranger to our *laws. When the temporary register of the America [*28 was obtained in New York, perjury must have been committed. When it was delivered up, a new perjury must have followed. When she arrived in this port from Madrass, the entry both of vessel and cargo, must have been accompanied with perjury. She then ought to have paid alien duties, because an American vessel once sold to an alien, can never revive her American character.—The United States are thus deprived of their just duties, and though Maybin has executed the bill of sale, the difference between the alien and domestic duties remains unpaid. Underwriters have been defrauded in the case of the Hannah, covered under the names of Anthony and Company, when they paid the loss, supposed to have accrued to American property. An insurance contemplating a deceit on belligerent nations, is clearly a fraud, and necessarily renders American property in greater danger of capture. The undertaking therefore on the parts of the company, in consideration of commissions, and interest on money advanced by them, to lend their assistance to Coulon, was an iniquitous act, in direct violation of the laws of nations, of the United States, and of the plain principles of fair dealing. The services were rendered, and the monies paid to effectuate an illegal and immoral pur-

pose. It was more than *malum prohibitum.* Joseph Anthony and Company were parties with Coulon, in the unlawful contract, not partners. They bought vessels and goods with his money, and were the ostensible owners. He was kept out of sight, and was wholly unknown to the carpenters, artificers and material men. Hence they may well recover their just demands from Anthony and Company, because they were ignorant of the fraud. But if their labours or materials had been supplied, with a full knowledge of all the circumstances, the law would not lend them its assistance; for their cause of action would then have arose *ex turpi causa.*—Here the original agreement inevitably led to the crimes of perjury and fraud.

All contracts, the objects of which militate against the principles of morality, or which are entered into with a view to evade the law, being in their nature immoral, are essentially vicious, and cannot be supported. 1 Pow. Contra. 183. An agreement is unlawful, if it be to encourage unlawful acts or omissions, or to induce the omission of something, the doing of which is a duty in the person with whom it is made. Ib. 195. General reasons of policy and public expediency will invalidate contracts. Ib. 201. In Holman *v.* Johnson *et al.* Cowp. 343, Lord MANSFIELD says, no court will lend its aid to a man, who founds his cause of action upon an immoral or an illegal act. *If from the plaintiff's own stating, or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, then the court says he has no right to be assisted. If a house is let to a woman for purposes of prostitution, and the plaintiff is fully conusant of that fact, he cannot recover the rent. 1 Bos. and Pull. 341. Espin. Cas. N. P. 13. In Biggs *v.* Lawrence, 3 Term Rep. 456, Lord KENYON says a person suing in a court of law must disclose a fair transaction, and it must not appear from his own showing, at least, that he has infringed the laws of his country: and the other judges expressed the same opinion. If a Guernsey man collude with a person in England to evade the revenue laws by a sale of goods for a purpose of smuggling them into England, he shall not be assisted by the laws; and Lord KENYON said such conduct savoured strongly of immorality. 4 T. R. 467.—So a foreigner having packed up goods abroad by order of the buyer in a particular manner for smuggling them into England, and knowing at the time they were to be smuggled, cannot recover the value of them against the buyer. 5 T. R. 599.—The same principles are adopted by Lord C. J. EYRE in Lightfoot *et al. v.* Tenant, 1 Bos. and Pull. 554;—and he observes that no man ought to furnish another with the means of transgressing the law, knowing that he intends to make that use of them. Ib. 556. If an action be founded on a policy of assurance on a ship or goods employed or carried in the course of a contraband trade, no action lies on such policy: it would be a reproach to law and justice to counte-

nance such an action.   Ib. 279.   S. C. in B. R.   6 T. R. 723. Camden et al. v. Anderson.

In Faikney v. Reynous et al. 4 Burr. 2069, it was adjudged that a bond given to reimburse the compounders of difference of stocks, half of what he had paid for himself, and a person jointly concerned in the contracts compounded, was not void, and in that case Lord MANSFIELD is made to say that the of fence relied upon as furnishing a ground of defence against being liable to pay it was not *malum in se;* it was only prohibited by the act of parliament.   The other judges concurred, that it was a good bond, on the face of it, till the obligor could show that it was bad.   But in Petrie v. Hannay, 3 T. R. 421, Lord KENYON examines that case and ascertains that the whole argument at the bar and the decision of the court proceeded on the ground that they could not take into consideration matter which was not properly introduced by the plea: they thought, that as nothing illegal, as between those parties, was disclosed on the record, the payment of the money could not be resisted.   Erskine and Wood, in this argument, put this case.—Suppose A. and B., in partnership, contract for smuggling goods, and A. pays the *whole, and B. gives him his note for his proportion, it never was pretended [*30 that A. could recover on such note from B.   It is true three other judges differed in opinion from Lord KENYON, but it will be remembered that it was a case between partners, not *malum in se,* and where the plaintiff was not interested in the use of the money.   In the case now before the court the reverse holds in all those material particulars: and no case can be shown in the books, where the agreement of a party, having in view the breach of positive law, and involving necessarily in its effects the gross offences of perjury and fraud, has received the assistance of a court of justice.   In 3 Ves. jr. 373, it is said by the Lord Chancellor that it has been repeatedly adjudged if a man has been employed to buy smuggled goods, and paid for the goods, and the goods come to the hands of the person who employed him, that person shall not pay for the goods.   And so far has this principle been carried, that where a bill of exchange grew out of a stock jobbing transaction, drawn by the broker, who had paid the differences of those transactions with other persons, and indorsed to an innocent person who knew of the illegality of the first contract, it was adjudged that the indorser could not be permitted to recover on the bill in a court of law.   6 T. R. 61, Sturs v. Lashly.   In Booth v. Hodgson, Ib. 405.   A. B. and C. became partners in insuring ships, contrary to stat. 6 Geo. 1, c. 18, s. 12, but it was agreed that the policies should be underwritten in the name of A. only; several policies were effected and the premiums received by C. and D. as brokers: and it was held that A. could not recover those premiums from C. and D.   There, the court said, they would not suffer a case

to be garbled, parts of the transaction to be suppressed, and a mutilated state of it to be imposed on the court as the true and genuine transaction.    On the whole case disclosed the law would not raise a promise out of the illegal contract.    In Farmer *v.* Russel *et al.*, 1 Bos. and Pull. 297, Lord Chief Justice EYRE lays down the rule, that a demand, necessarily connected with an illegal contract, and tending to facilitate the execution of it, will be vitiated by that contract : and ROOK, J., says,. that if a plaintiff discloses a case of foul fraud on his own part, for which he merits an indictment, he ought not to be heard, however great the demerits of the defendant may be.    Ib. 300. EYRE C. J. declared himself well satisfied with the opinion in Camden and others *v.* Anderson, in the exchequer chamber, that violating a prohibition of a species of commerce in which the interest of the country was concerned, was not merely *malum prohibitum*, but *malum in se*.

Mr. Maybin became one of the partners of the firm in March *1796, and the America was not purchased, until the month of July following.    The demand set up by him is derived from a corrupted source, even supposing him to be unacquainted with the nature of the original transaction in all parts, which can scarcely be admitted.    Mr. Coulon has never waived the illegality of the contract : its immorality could not be waived. No hopes of success can be entertained by the adverse counsel, unless they are permitted to garble the case, and prevent the court from taking the whole into view.

But this cannot be done : they cannot marshal their advances of money to workmen or for materials, in one column by themselves.    They cannot balance the monies received for Coulon, with their enormous commissions of nearly $40,000, and transpose the payments at their will and pleasure.    The doctrine of creditors applying payments in a running commercial account, has never yet been adopted.

The arguments of the counsel, on the part of the executors and of the surviving partner were as follows :

In the language of Judge GROSE, 3 T. R. 425, the defence set up is against all honour and honesty.    Coulon comes before the court with an ill grace indeed.    He arrived in this country after the British had gained a decided superiority at sea over the French nation, and wished to partake of the benefits of a neutral trade.    A mutual confidence took place between himself, Joseph Anthony and Son : he seduced them from the path of their duty as citizens of the United States, and after their deaths reproaches their memories with crimes of which he was the sole cause.    Before the referees he affirmed the execution of the original contract ; and now finding himself foiled and disappointed in his expectations, as to the relative merits of the controversy between them, has recourse to a law payment, to discharge a balance due from him, on every principle, which should influence his conduct.

The legal question before the court may be considered under two general heads.

1. Is it competent to Coulon, under existing circumstances, after the reports filed, to urge the illegality and consequent invalidity of the contract?

2. Is the suit immediately in question founded on such a contract as cannot be enforced?

I. The case of Watts v. Brooks, 3 Ves. jr. 612, is strongly in our favour. There, was a contract to be jointly concerned in ship insurances, which is made void by stat. 6 Geo. 1. c. 18. s. 12. The policies were subscribed by them in their separate names; and on a bill brought for a general account of all their *dealings and transactions, the lord chancellor said, he did not execute a contract against law, by directing a general [*32 account. He thus expressed himself: "When the parties have "had dealings together upon a variety of transactions, and losses "have been incurred and paid, and a general account is sought, "I should do injustice if I did not give the advantage, if any ad- "vantage has arisen, or charge any loss which has happened. "If it had been a smuggling business, and they had been set- "tling profit and loss upon a course of smuggling transactions, "I should do great injustice if I did not bring that into the ac- "count. So upon stock transactions, though the court would "not execute the contract, yet when the parties have been set- "tling stock dealings, and paying differences, I must bring those "into the account."

He said there was nothing immoral in the transaction, but it was against a prohibitory statute. But the present case before the court possesses much stronger features.

Here the agreement between the parties, has been executed by judges of the parties own choosing, under a rule of this court. And whoever makes an exception to a report, must substantiate it, or he fails. Here it is incumbent on Coulon to satisfy the court, that the identical money reported to be due from him, arises from an unlawful or immoral ground.

Contracts executed, may be inforced though the court would not aid them in the first instance. 1 Pow. Contr. 200. In Faikney v. Reynous et al. cited from 4 Burr. 2069 (S. C. 1 W. Bla. 633) a bond given for differences on stock jobbing transactions, was held good: And though Lord Kenyon has undertaken to say, that the decision of that case went on the form of the plea; yet Ashurst and the other judges were of a different opinion, and asserted that the court permitted a discussion of the facts stated in the plea, and they argued from them, 3 T. R. 422. Buller, J. observes, that Lord Mansfield was silent on the question of pleading, and that he gave his opinion on the general ground, that if one person apply to another to pay his debt (whether contracted on the score of usury, or for any other purpose, it makes no difference) he is entitled to recover it back again. Ib. 424. There money was lent to another to fulfil a

prohibited contract; but we are now arguing the validity of a re-
port wherein it has been the uniform practice, to demand the ex-
posure of some mistake of a clear principle of law leading to
injustice, before the court will set it aside.

As to Steers *v.* Lashley, 6 T. R. 61, which has been cited, the
dispute concerning the differences was not referred by rule of
court, because the remedy would then have been by attach-
ment, under the stat. of Will. 3 ; and in fact the plaintiff was one
\*33] *of the arbitrators. The whole was a stock jobbing
business, and if the differences had been paid, the court
would not have interfered : because Lord KENYON expressly
agreed, that if the plaintiff had lent this money to the defend-
ant to pay the differences, and had afterwards received the bill
in question for that sum, then he might have recovered.

The Little Martha was bought in Halifax in 1798, after the
naturalization of Coulon in February preceding, and Anthony
and Company became the paymasters. The America arrived
here from Madrass in March 1798. Anthony and Company ex-
pended on her, in repairs after her arrival no less a sum than
$40,980 60 cents (which exceeds the sum found due) over and
above a considerable advance for seamen's wages, which are
supposed to be unexceptionable. Is it possible, that Coulon can
obtain credit for the $60,000 for which she was sold, and leave
the repairs unpaid, which have so greatly augmented her price ?
He cannot affirm and disaffirm in the same breath : when he has
once made his election, he must abide by it. If the company
cannot garble the transaction, neither can Coulon cull the items
of the accounts at his pleasure. If exceptionable articles are
struck out on one side, so also must they be on the other. But
the rule holds only as to executory contracts : this has been exe-
cuted by the report of the referees, who have settled the ac-
counts.

Between 1794 and 1803, a great variety of transactions have
taken place between the parties to the amount of nearly $500,000;
many of the articles are confessedly legal, in their strictest view.
What principle would prevent Anthony and Company, or the
surviving partner even at this day, from appropriating the pay-
ments ?

In Ashbrook *v.* Hall, in C. B. cited Cowp. 348, where money
was paid for the defendant for a gaming debt, it was held re-
coverable. And in Petri *v.* Hannay, already cited, Lord KENYON
states that smuggling is not *malum in se,* as contradistinguished
from *malum prohibitum.* 3 T. R. 422.

II. It will be found on examination of all the cases, cited by
the adverse counsel, except Steers *v.* Lashley (6 T. R. 61,) that
they go to the cases of principals in illegal transactions, and
not third persons. Anthony and Company do not fall within
the spirit of those decisions. And it cannot be denied, that in
the excepted case Lord KENYON in the absence of GROSE and
LAWRENCE Justices, made very free with former decisions.

[Coulon *v.* Anthony's ex'rs and Maybin et e contra.]

In many of the authorities, which have been adduced, the contracts were avoided by positive law.

. We lay much stress on the payments and disbursements made by Anthony and Company, as the agents of Coulon, to tradesmen *and material men for repairs to the America after her arrival from the East Indies, when nothing illegal was [*34 meditated. We presume, no case can be shewn, where an agent has paid honest and fair debts for his constituent, which might have been enforced against him, and could not recover the same from his principal.

An enhanced price has been obtained for this vessel, in consequence of these repairs, which has gone to the emolument of Coulon : and why should he not repay them ? One who receives money to another's use, on an illegal contract, cannot be allowed to retain it. One who pays over money to another's use, cannot dispute the legality of the original consideration : having once waived the legality, the money shall never come back into his hands again. Tenant *v.* Elliott, 1 Bos. and Pull. 4. No case is to be found where money has been actually paid by one of two parties to the other, upon an illegal contract, both being *participes criminis,* an action has been maintained to recover it back again. Per Lord Kenyon, 8 T. R. 577.

But our great reliance is on the case of Watts *v.* Brooks, 3 Ves. jr. 612, where there was a bill and decree for a general account. It bears a strong analogy to that under consideration.

The court kept the matter some days under advisement; and afterwards SHIPPEN, C. J. delivered the opinion of the court.

There appears in this case to be a just debt, as between the parties, due from Coulon to Maybin, the surviving partner of Anthony and Company. The payment thereof is resisted by the very man, at whose instance and for whose benefit those laws have been violated, which form the great objection to the recovery of it. If it were therefore possible for us, consistent with the laws of the land, to enforce the recovery, we feel the strongest disposition to do it. We have, however, fully considered the case in all its parts, together with the authorities cited on both sides, and are compelled to say, the laws of the United States, the great principles of public policy, and the regard we must pay to the evident prosperity and safety of our country, which would be endangered by permitting its navigation laws to be violated or evaded, absolutely forbid our affording the aid of this court, to the recovery of a debt founded upon such a violation or evasion. The debt originated in a contract between a foreigner and a citizen, to mask the property of the foreigner, by purchasing and equipping vessels with his money and for his use, and by registering and navigating them in the names of American citizens ; which could not be done without the grossest perjury.

We listened with some satisfaction to the distinctions made by

4 YEATES—3

the counsel of the surviving partner, tending to show a separation *of the balance found by the referees from the illegal transactions : but we find the whole so connected, that it is impossible to separate them.    The balance is, in part at least, formed by allowances made or commissions on these transactions, and interest on advances made on that account ; and in order to settle this balance, it was necessary for the referees to connect and consider the whole business together.    No part seems to be untainted by the original violation of the laws, which we are sworn to support.

The other exceptions to the report, might, we think, have been got over, but this cannot.

The letter written by Mr. Maybin to one of the referees, is certainly exceptionable, as containing persuasions to befriend him : although as the main intent of it seems calculated rather to procure his consent to act as a referee, than to influence his judgment in the decision, we think it insufficient to invalidate the reports : and we only take this notice of it, lest we should seem to countenance this kind of applications to individual referees, which we certainly disapprove.

There is no task more repugnant to the feelings of conscientious judges, than to be obliged to decide against the justice of the case, but imperious law and the public good require it here. We are therefore compelled to say, the reports must be set aside.